**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

LAURA DAVIS,          }
                             }
     Plaintiff,        }
                             }
v.                      }     **Case No.: 4:18-cv-02034-MHH**
                             }
ANDREW SAUL,      }
Commissioner of the     }
Social Security Administration, }
                             }
     Defendant.     }

## MEMORANDUM OPINION

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), plaintiff Laura Davis seeks judicial review of a final adverse decision of the Commissioner of Social Security. The Commissioner denied Ms. Davis's claims for disability insurance benefits and supplemental security income. For the reasons stated below, the Court affirms the Commissioner's decision because substantial evidence supports the decision.

## I. PROCEDURAL HISTORY

Ms. Davis applied for disability insurance benefits and supplemental security income. (Doc. 6-4, pp. 41, 40). She alleges that her disability began on December 31, 2014. (Doc. 6-4, pp. 41, 40). The Commissioner initially denied Ms. Davis's claims. (Doc. 6-4, pp. 41, 40). Ms. Davis requested a hearing before

an Administrative Law Judge (ALJ). (Doc. 6-5, p. 16). The ALJ issued an unfavorable decision. (Doc. 6-3, pp. 24-38). The Appeals Council declined Ms. Davis's request for review, making the Commissioner's decision final for this Court's judicial review. (Doc. 6-3, p. 2). *See* 42 U.S.C. §§ 405(g) and 1383(c).

## II. STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v.*

*Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III.   SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

The ALJ determined that Ms. Davis meets the Social Security Act's insured status requirements through December 31, 2018, and that Ms. Davis has not engaged in substantial gainful activity since the alleged onset date of December 31,

2014.  (Doc. 6-3, pp. 18, 26).  The ALJ determined that Ms. Davis suffers from the following severe impairments:  degenerative disc disease, carpal tunnel syndrome, affective disorder, and, anxiety disorder.  (Doc. 6-3, p. 26).  The ALJ determined that Ms. Davis suffers from the non-severe impairments of sciatica and plantar fasciitis.  (Doc. 6-3, p. 27).[1]  Based on a review of the medical evidence, the ALJ concluded that Ms. Davis does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Doc. 6-3, p. 27).

Given these impairments, the ALJ evaluated Ms. Davis's residual functional capacity.  The ALJ determined that Ms. Davis has the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except she  can occasionally climb, stoop, kneel, crouch, and crawl, but not use ropes, ladders, or scaffolds.  (Doc. 6-3, p. 31).  The ALJ found that Ms. Davis:

> must avoid concentrated exposure to extreme cold, vibrations, hazardous machinery and unprotected heights, and would be capable of performing simple routine job tasks requiring occasional contact with the general public and co-workers.  Claimant is limited to no more than frequent fine and gross manipulation with the right dominant hand.

---

[1] "Sciatica refers to pain that radiates along the sciatic nerve and is typically felt in the buttocks, down the back of the leg, and possibly to the foot. Sciatica is typically caused by common conditions including a herniated disc, degenerative disc disease and lumbar spinal stenosis." https://www.spine-health.com/glossary/sciatica (last visited Dec. 16, 2019).

(Doc. 6-3, p. 31). "Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a). "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. §§ 404.1567(a), 416.967(a). "Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

Based on this RFC, the ALJ concluded that Ms. Davis is unable to perform her past relevant work as a childcare worker, windshield inspector, cook, or home aide. (Doc. 6-3, p. 36). Relying on testimony from a vocational expert, the ALJ found that jobs exist in the national economy that Ms. Davis can perform, including final assembler, wire tapper, and optical goods assembler. (Doc. 6-3, p. 37). Accordingly, the ALJ determined that Ms. Davis has not been under a disability within the meaning of the Social Security Act. (Doc. 6-3, p. 38).

## IV. ANALYSIS

Ms. Davis contends that she is entitled to relief from the ALJ's decision because the ALJ asked the vocational expert an unclear hypothetical question and because the ALJ evaluated her pain testimony improperly. (Doc. 8, pp. 13, 15, 16). The Court begins its analysis of these issues with a review of the ALJ's pain assessment and then considers the ALJ's hypothetical question.

A.   Pain Standard

The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through his own testimony of pain or other subjective symptoms." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r, Soc. Sec. Admin.*, No. 18-11954, 2019 WL 1975989, at *3 (11th Cir. May 3, 2019).  When relying upon subjective symptoms to establish disability, "the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptoms]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms]." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223); *Chatham v. Comm'r, Soc. Sec. Admin.*, No. 18-11708, 2019 WL 1758438, at *2 (11th Cir. Apr. 18, 2019) (citing *Wilson*).  If the ALJ does not properly apply the three-part standard, reversal is appropriate. *McLain v. Comm'r, Soc. Sec. Admin.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's credible testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223; *see Gombash v. Comm'r, Soc. Sec. Admin.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that he has a disability 'through

his own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). If an ALJ rejects a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson,* 284 F.3d at 1225; *Coley*, 2019 WL 1975989, at *3. As a matter of law, the Secretary must accept the claimant's testimony if the ALJ inadequately or improperly discredits the testimony. *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Kalishek v. Comm'r, Soc. Sec. Admin.*, 470 Fed. Appx. 868, 871 (11th Cir. 2012) (citing *Cannon*); *see Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987) ("It is established in this circuit if the Secretary fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, then the Secretary, as a matter of law, has accepted that testimony as true.").

When credibility is at issue, the provisions of Social Security Regulation 16-3p apply. SSR 16-3p provides:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4. An ALJ must explain the basis for findings relating to a claimant's description of symptoms:

> [I]t is not sufficient . . . to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough . . . simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2016 WL 1119029, at *10. In evaluating a claimant's reported symptoms, an ALJ must consider:

> (i) [the claimant's] daily activities; (ii) [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms; (iii) [p]recipitating and aggravating factors; (iv) [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms; (v) [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms; (vi) [a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r, Soc. Sec. Admin.*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

Here, the ALJ found that Ms. Davis's medical records, including documentation of sporadic subjective complaints of back pain and mild carpal tunnel syndrome, do not support Ms. Davis's testimony regarding her pain and limitations. (Doc. 6-3, pp. 32-33). Accordingly, the Court examines Ms. Davis's

testimony and then compares her testimony to the medical and other evidence in the record.

1.      Ms. Davis's Testimony

Ms. Davis testified that she has three children.  (Doc. 6-3, p. 51).  Ms. Davis's youngest child was 16 years old when the hearing took place.  (Doc. 6-3, p. 51).  According to Ms. Davis, she is unable to work primarily because of herniated discs in her back and bipolar disorder.  She also suffers from depression and carpal tunnel syndrome.  (Doc. 6-3, p. 59).  Ms. Davis testified that she has back pain on the right and sciatica on the left radiating down into both legs.  (Doc. 6-3, pp. 59-60).

Ms. Davis recalled that she stopped working in poultry at Cagle's in 2013 after her "back started acting up."  (Doc. 6-3, p. 58).  Ms. Davis testified that she took "more breaks" and left her "line to go sit down" because of back pain.  (Doc. 6-3, p. 58).  Ms. Davis testified that she spent three months doing laundry for Days Inn in 2014.  (Doc. 6-3, p. 58).  According to Ms. Davis, she was unable to perform that job because the position involved "too much bending over and putting stuff in the washers and dryers."  (Doc. 6-3, p. 58).  Ms. Davis recalled being a launderer for Best Western in 2014 before she stopped working completely.  (Doc. 6-3, p. 58).  Since then, Ms. Davis testified that her children have taken care of her. (Doc. 6-3, p. 59).

Ms. Davis testified that taking tramadol helps "some" to manage her pain. (Doc. 6-3, p. 60).[2]  Ms. Davis rated her pain seven out of ten with medication. (Doc. 6-3, p. 60).  Ms. Davis testified that getting out of a chair or bed, bending, stretching, or reaching exacerbates her pain.  (Doc. 6-3, p. 60).  According to Ms. Davis, she alternates between sitting and standing for 20 or 25 minutes.  (Doc. 6-3, pp. 60-61).  Ms. Davis testified that she cannot walk beyond 20 minutes and cannot lift anything over five pounds.  (Doc. 6-3, p. 61).  According to Ms. Davis, she "tr[ies] not to lift anything heavy because it pulls on [her] back."  (Doc. 6-3, p. 61].  Ms. Davis testified that she uses a heating pad and ice 15 minutes daily to reduce her pain.  (Doc. 6-3, p. 61).  According to Ms. Davis, she lies down about an hour and a half daily to manage her pain.  (Doc. 6-3, pp. 61-62).

Ms. Davis testified that she tries not to move her dominant right hand because carpal tunnel syndrome causes her hand to "cramp[] up" and her fingers to stiffen so that she can "hardly bend them."  (Doc. 6-3, pp. 63, 64).  According to Ms. Davis, she experiences these symptoms after using her hand for three or four minutes and has to rest a few minutes (or longer) before the symptoms subside.  (Doc. 6-3, p. 64).  Ms. Davis testified that she manages her carpal tunnel syndrome

---

[2] Tramadol "is used to help relieve moderate to moderately severe pain [and] is similar to opioid (narcotic) analgesics."  https://www.webmd.com/drugs/2/drug-4398-5239/tramadol-oral/tramadol-oral/details (last visited Dec. 18, 2019).

symptoms with heat and ice and the same pain and anti-inflammation medication she takes for her back. (Doc. 6-3, pp. 64, 63).[3]

Ms. Davis testified that her husband does many of the household chores, but she is able to fold clothes and vacuum. (Doc. 6-3, p. 64). According to Ms. Davis, she cannot mop because "it pulls [her] back." (Doc. 6-3, p. 64). Ms. Davis testified that cooking is not an issue because she and her husband eat out. (Doc. 6-3, p. 64). Ms. Davis testified that she avoids bending to pick something off of the floor. (Doc. 6-3, p. 65). According to Ms. Davis, she has difficulty grabbing onto items and cannot open a jar if someone has twisted the lid on tightly. (Doc. 6-3, pp. 65, 66).

In August 2015, two years before her administrative hearing, Ms. Davis completed a functional report. In it, she stated that after getting up and going to the bathroom in the morning, she sits on the couch for a few minutes to rest her back. (Doc. 6-7, pp. 35, 27); (Doc. 6-3, p. 46). According to the report, Ms. Davis cannot stand more than 15 minutes at a time and uses a heating pad or pillows for her back when sitting. (Doc. 6-7, p. 27). Ms. Davis indicated that her granddaughter helps her with laundry so that Ms. Davis may avoid bending. (Doc. 6-7, pp. 27-28). Ms. Davis reported that she cooks occasionally. (Doc. 6-7, p. 28).

---

[3] Ms. Davis testified that she takes anti-inflammatory medication to manage her foot pain attributable to plantar fasciitis. (Doc. 6-3, p. 66).

She stated that pain wakes her up nightly and prevents her from falling back to sleep quickly.  (Doc. 6-7, p. 28).

Ms. Davis reported that she sits down to put on pants or shoes, has trouble getting in and out of the shower, and cannot shave her legs because bending hurts her back.  (Doc. 6-7, p. 29).  Ms. Davis stated she can fix her hair, feed herself, and use the toilet without difficulty.  (Doc. 6-7, p. 29).  Ms. Davis reported she cannot mow the lawn or mop because her "back gives out" and that her kids "pretty much do" the house and yard work.  (Doc. 6-7, p. 30).  Ms. Davis stated that she can drive short distances, but she does not take long trips because of pain.  (Doc. 6-7, p. 30).  Ms. Davis stated she can shop weekly for 20 minutes.  (Doc. 6-7, p. 30).

Ms. Davis reported using a heating pad, alternating between sitting and standing, and changing positions when watching television.  (Doc. 6-7, p. 32).  According to Ms. Davis, her back pain causes problems with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling and stair climbing.  (Doc. 6-7, p. 33).  Ms. Davis stated that she cannot "stand, walk, or sit for long periods." (Doc. 6-7, p. 33).  Ms. Davis indicated that she can walk 60 feet before needing to rest "until [her] back [pain] eases up."  (Doc. 6-7, p. 33).  Ms. Davis reported that a doctor prescribed a brace for her in August 2015 and that she uses the brace and a cane daily.  (Doc. 6-7, p. 34).  Ms. Davis did not identify functional problems with her hands.  (Doc. 6-7, p. 33).  Ms. Davis remarked:

My life is awful[.] [I] hurt from [the] time [I] get up [until] [I] go to sleep[.] [I] have to take pain pills every day.  I can't hangout with friends or do anything[.] [I]'m only 43 and [I] feel 70. Sometimes [I] w[ant to] give up but [I] know [I] can't.

 (Doc. 6-7, p. 35).

2.     Medical Records

Because of Ms. Davis's history of back pain, in May 2012, Dr. Palmer, an

orthopedist, referred Ms. Davis to Dr. Barnett for an MRI.  (Doc. 6-8, p. 93).  Dr.

Barnett reported the following findings about Ms. Davis's back:

There is normal lordotic alignment.  Paravertebral soft tissue appear unremarkable. Marrow signal shows no significant abnormality. The conus medullaris and cauda equina appear unremarkable.

L1-4 discs are preserved.

L4-5 disc shows a small midline protrusion. There is mild deflection of the proximal left L5 nerve root seen best on axial image #10. Underlying disc bulge produces mild left and slight right foraminal narrowing.

L5-S1 disc shows minimal bulging to the left with slight left foraminal encroachment.  There is mild bilateral facet hypertrophy.

IMPRESSION:
1.     L4-5 disc protrusion, small, mild compression of the left L5 nerve root.
2.     Small L5-S1 disc bulge, concentric to the left.
3.     Facet hypertrophy lumbosacral junction.

(Doc. 6-8, p. 93).

Before her onset date, in 2013 and 2014, Ms. Davis described to her primary

care physician, Dr. Deerman, her back problems.  (Doc. 6-8, pp. 90, 91, 73)

(complaints of back pain in July 2013, March 2014, April 2014, and August 2014).[4]  In July 2013, Dr. Deerman prescribed several medications including tramadol (120 mg tablets for pain), Mobic (15 mg tablets for pain), and Robaxin (a muscle relaxer) to manage Ms. Davis's pain.  (Doc. 6-8, p. 91).  Dr. Deerman reviewed Ms. Davis's 2012 MRI results and indicated that she should have another MRI.  (Doc. 6-8, p. 91).  According to July 2013 notes, Ms. Davis needed to use conservative pain treatment for four weeks before she could receive approval for another MRI.  (Doc. 6-8, p. 91).

During the April 2014 visit, Dr. Deerman considered referring Ms. Davis to a back doctor.  (Doc. 6-8, p. 90).  According to the visit notes, the doctors contacted were not willing to accept Ms. Davis as a patient because the doctors did not "provide services for Medicaid."  (Doc. 6-8, p. 90).  Ms. Davis received Mobic and tramadol refills.  (Doc. 6-8, p. 90).

In August 2014, Ms. Davis told Dr. Deerman that she had seen Dr. Stewart, a pain doctor and that she was receiving epidural-shot treatments with an injection scheduled in one week.  (Doc. 6-8, p. 90).   Ms. Davis told Dr. Deerman that her pain was bad and that Tylenol and tramadol were "no help."  (Doc. 6-8, p. 90).  Dr. Deerman observed that Ms. Davis "look[ed] uncomfortable," and he detected S-1

---

[4] The notes from Ms. Davis's visits to Dr. Deerman are handwritten and, at times, difficult to interpret.  The Court includes in its analysis discussion of information from Dr. Deerman's records that the Court has identified with reasonable certainty.

sciatic nerve pain on her right side.  (Doc. 6-8, p. 90).  Dr. Deerman prescribed Norco for pain.  (Doc. 6-8, p. 90).[5]

When she saw Dr. Deerman in February 2015, Ms. Davis reported back pain and a knot in her right wrist that was painful.  (Doc. 6-8, p. 89).  Ms. Davis reported that she had received three epidural injections from Dr. Stewart and was scheduled for another injection in November 2015.  (Doc. 6-8, p. 89).  Dr. Deerman noted that back surgery might be an option for Ms. Davis.  (Doc. 6-8, p. 89).  Dr. Deerman detected tenderness in Ms. Davis's right wrist.  (Doc. 6-8, p. 89).  According to Dr. Deerman's notes, Ms. Davis requested a work excuse and received a Norco refill and a prescription for dexamethasone.  (Doc. 6-8, p. 89).[6]

Ms. Davis returned to Dr. Deerman in August 2015, complaining of back and wrist pain.  (Doc. 6-8, p. 89).  Ms. Davis denied injury but reported quitting her job because of pain.  (Doc. 6-8, p. 89).  Dr. Deerman diagnosed Ms. Davis with right-hand carpal tunnel syndrome.  (Doc. 6-8, p. 89).  Dr. Deerman did not document clinical findings about Ms. Davis's hand or wrist functioning.  (Doc. 6-8, p. 89).  Ms. Davis received refills on Norco and dexamethasone.  (Doc. 6-8, p. 89).

---

[5] Norco is a combination medication used to treat moderate to severe pain. https://www.rxlist.com/norco-5-325-drug.htm#indications (last visited Dec. 5, 2019).

[6] "Dexamethasone is a corticosteroid that prevents the release of substances in the body that cause inflammation."  https://www.drugs.com/dexamethasone.html (last visited Dec. 17, 2019).

After applying for disability benefits in August 2015, in September 2015, Ms. Davis saw Dr. Kayl, a consultative examiner. (Doc. 6-8, p. 73). Dr. Kayl provided the following summary of Ms. Davis's back condition:

> Diagnosed in 2011. No injury. No surgeries. Currently on pain medications prn. She states it keeps her from working because she is in constant pain. States she is unable to lift or bend anything. Pain with standing in one place for any length of time.
>
> . . .
>
> The claimant has had pain and difficulty in her lumbar vertebrae. The most severely affected area is the lumbar vertebrae.

(Doc. 6-8, p. 73, 74). Concerning Ms. Davis's carpal tunnel syndrome, Dr. Kayl noted:

> Diagnosed in August of this year. [N]o surgery. No medications currently. Thinks this makes her disabled because she says she can't use her hands at all when it flares up or grip anything.

(Doc. 6-8, p. 73).

Ms. Davis told Dr. Kayl that she quit her job. (Doc. 6-8, p. 74). Ms. Davis stated that "she did not use an ambulatory device to get around" and that she could "walk up to a mile on level ground." (Doc. 6-8, p. 74). Ms. Davis expressed having "difficulty standing for 15-30 minutes" or climbing more than two or three steps. (Doc. 6-8, p. 74).

Ms. Davis explained that she could feed and dress herself, but she could not do yard work. (Doc. 6-8, p. 74). Ms. Davis reported that she could open

doorknobs and that she had difficulty "lifting more than 10-25 pounds." (Doc. 6-8, p. 74).

Dr. Kayl noted that Ms. Davis was "able to get up and out of the chair" and "on and off the examination table" without difficulty. (Doc. 6-8, p. 75). Dr. Kayl observed that Ms. Davis walked with a normal gait and without difficulty. (Doc. 6-8, p. 75). Dr. Kayl's spine and extremities findings revealed no scoliosis, spasm of the paraspinous muscles, or kyphosis. (Doc. 6-8, p. 76).[7] Ms. Davis could walk on her toes and heels. (Doc. 6-8, p. 75). Ms. Davis's straight leg testing results were negative for pain. (Doc. 6-8, p. 76). Ms. Davis had difficulty squatting, bending over, and touching her toes. (Doc. 6-8, p. 76). Ms. Davis demonstrated normal grip strength, a full range of motion in her hands and wrists, and normal fine and gross manipulation skills. (Doc. 6-8, pp. 76-77). Ms. Davis's "[m]otor strength was 5/5" and her "sensation was intact" in all extremities. (Doc. 6-8, p. 77). Dr. Kayl found that Ms. Davis had a limited range of lumbar back and hip motion. (Doc. 6-8, p. 77).

Dr. Kayl determined that Ms. Davis had functional limitations. (Doc. 6-8, p. 78). Specifically, Dr. Kayl determined that Ms. Davis is unable to stand, sit, or walk continuously during an eight-hour time period, but that Ms. Davis can

---

[7] "Kyphosis is a spinal disorder in which an excessive outward curve of the spine results in an abnormal rounding of the upper back." https://orthoinfo.aaos.org/en/diseases--conditions/kyphosis-roundback-of-the-spine (last visited Dec. 18, 2019).

perform each activity frequently—between one-third and two-thirds of a work day. (Doc. 6-8, p. 78). Dr. Kayl described as "limited" Ms. Davis's ability to bend or stoop. (Doc. 6-8, p. 78). Dr. Kayl noted that Ms. Davis walked "without difficulty and without [an] assistive device." (Doc. 6-8, p. 78). Dr. Kayl listed no functional limitations because of Ms. Davis's carpal tunnel syndrome. (Doc. 6-8, p. 78).

Ms. Davis visited Dr. Deerman twice in October 2015. (Doc. 6-8, p. 88). During the first October visit, Ms. Davis complained of "back trouble," and she limped some on her right side. (Doc. 6-8, p. 88). Dr. Deerman noted tenderness in Ms. Davis's neck. (Doc. 6-8, p. 88). Ms. Davis reported that bedrest for three days had helped ease the pain. (Doc. 6-8, p. 88). Ms. Davis received refills of Norco and dexamethasone and a prescription for Cymbalta. (Doc. 6-8, p. 88).

Ms. Davis complained of depression during the second October 2015 visit. (Doc. 6-8, p. 88). Ms. Davis reported experiencing suicidal thoughts after she began using Cymbalta. According to Dr. Deerman's notes, Ms. Davis did not report back or wrist pain. (Doc. 6-8, p. 88).

Ms. Davis next complained of back pain to Dr. Deerman in September 2016 and requested steroid injections. (Doc. 6-9, p. 16). Ms. Davis explained that the pain had started two weeks earlier. (Doc. 6-9, p. 16). Dr. Deerman noted tenderness on the right L-3 area and neck tightness. (Doc. 6-9, p. 16). Dr.

Deerman diagnosed Ms. Davis with neck and back muscle strain. (Doc. 6-9, p. 16).

Ms. Davis received medical treatment in 2016 from providers with NE Alabama Health Services (AHS). (Doc. 6-9, p. 41). During visits to AHS in February, March, April and May of 2016, Ms. Davis complained of a dental problem but not back or wrist pain. (*See* Doc. 6-9, pp. 78, 74, 71, 68, 65, 62, 59, 55, 52, 49, 46) (complaining of a dental concern and listing anxiety, bipolar disorder, episodic mood disorder, and depression as active problems). During a visit for medication refills in October 2016, Ms. Davis reported chronic low back pain to an AHS certified registered nurse practitioner. (Doc. 6-9, pp. 42, 43). According to the treatment notes, Ms. Davis's gait, stance, and musculoskeletal findings were normal. (Doc. 6-9, p. 44). Ms. Davis showed no signs of acute distress. (Doc. 6-9, p. 43). Ms. Davis received a prescription for diclofenac sodium (one 75 mg tablet twice daily) for back pain. (Doc. 6-9, p. 44).[8]

Ms. Davis visited Dr. Ata, a general physician with Pisgah Medical Clinic, as a new patient in December 2016 and complained of anxiety and depression. (Doc. 6-9, pp. 32, 33). In January 2017, Ms. Davis returned to Dr. Ata and

---

[8] Diclofenac sodium is the generic form of Voltaren and is a nonsteroidal anti-inflammatory medication "used to relieve pain, swelling (inflammation), and joint stiffness caused by arthritis." https://www.webmd.com/drugs/2/drug-4284-4049/diclofenac-oral/diclofenac-sodium-enteric-coated-tablet-oral/details (last visited Dec. 18, 2019).

complained of back pain. (Doc. 6-9, pp. 30, 31). Dr. Ata described Ms. Davis's

back complaint:

> Back pain since 2011 with numbness in right foot. Nature of pain is constant and aching. Pain level on initial assessment is 6 with[out] medication and 3 with medication. Pain aggravates with walking, sitting, bending and lifting and working. . . . The patient was advised [of] x-rays of L-spine. She was given Neurontin 300 mg at night. She was given Voltaren 75 mg b.i.d.

(Doc. 6-9, p. 31). Ms. Davis complained of back pain to Dr. Deerman in January

2017. (Doc. 6-9, p. 85). According to Dr. Deerman's notes, Ms. Davis was

screaming and crying because her back pain medication, Celexa, was not working

well. (Doc. 6-9, p. 85).

Ms. Davis returned to Dr. Ata in February 2017. (Doc. 6-9, p. 40). Dr. Ata

summarized the improved status of Ms. Davis's back pain:

> This patient is here for follow-up on chronic pain disorder and osteoarthritis. The patient reports to be doing quite well on current management. The patient describes no change in pain level on a scale of 1-10. The patient is tolerating medication well and denies any side effects of medication. The patient does not desire any surgical intervention. According to the patient, medication[s] are controlling the symptoms quite well. Medications are helping to control the pain and keep the patient comfortable and enable the patient to do activities of daily living without much discomfort. . . . The patient recently had x-rays of L-spine, which did not reveal any significant abnormality. The patient was told about these results. She was advised to continue Voltaren. She was given Tylenol No. 3 one b.i.d. p.r.n. #56. She was advised [of] physical therapy of the back. Follow up with orthopedic if symptoms continue.

(Doc. 6-9, p. 40). When Ms. Davis visited Dr. Ata for medication refills in March 2017, she did not complain of back pain and reported that "her medications [were] working well." She had a normal gait. (Doc. 6-9, pp. 37, 38).

### 3. The ALJ's Assessment of Ms. Davis's Records

The ALJ discounted Ms. Davis's complaints of back pain and carpal tunnel syndrome symptoms. The ALJ found that Ms. Davis's impairments "could reasonably be expected to produce some symptoms." But the ALJ determined that Ms. Davis's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Doc. 6-3, p. 35). The ALJ observed that Ms. Davis's medical records "indicate only sporadic back pain." (Doc. 6-3, p. 32). The ALJ credited Ms. Davis's statements about her limited functioning "only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence." (Doc. 6-3, p. 35).

### 4. Analysis

The ALJ overlooked some of the medical records that relate to Ms. Davis's back pain. As the summary above indicates, Ms. Davis's medical records confirm that she experienced back pain before and during the disability period. Ms. Davis began taking prescription pain medication in 2013. Her doctors prescribed a variety of medications for back pain, and she received steroid injections to manage

her back pain. (Doc. 6-8, p. 91; Doc. 6-9, pp. 89, 16). Dr. Deerman observed Ms. Davis limping in October 2015, and Ms. Davis repeatedly complained of significant back pain to Dr. Deerman. (Doc. 6-8, p. 88; Doc. 6-9, p. 85). These parts of Ms. Davis's medical history are consistent with her pain testimony.

Other parts of her medical history are not. During several visits with treating providers, Ms. Davis complained of issues other than back pain (*see, e.g.*, Doc. 6-9, pp. 46, 49, 52, 55, 62, 65, 68, 71, 74, 78), explained that she was experiencing episodic back pain (Doc. 6-8, p. 88; Doc. 6-9, p. 16), or reported that her medication was managing her back pain effectively. (Doc. 6-9, p. 40).

In September 2017, Ms. Davis testified that her pain level was a seven with medication. (Doc. 6-3, p. 60). But in January 2017, she told Dr. Ata that her pain was three with medication and six without it. (Doc. 6-9, p. 31). Ms. Davis testified that pain limited her ability to do certain activities. (Doc. 6-3, pp. 64, 65). But in February 2017, Ms. Davis reported to Dr. Ata that she was "doing quite well" and performing daily activities "without much discomfort." (Doc. 6-9, p. 40).

Ms. Davis reported to Dr. Kayl that she (Ms. Davis) could walk one mile but that she had difficulty standing and climbing. (Doc. 6-8, p. 74). Ms. Davis told Dr. Ata that back pain limited her ability to sit, stand, and walk. (Doc. 6-9, p. 31). But according to Dr. Deerman's treatment notes, Ms. Davis did not complain regularly

of difficulties doing these activities, and Ms. Davis did not request an ambulatory device. Some of Ms. Davis's medical records indicate that occasionally she experienced trouble walking during the disability period, but other records indicate that Ms. Davis walked normally. (Doc. 6-8, p. 88; Doc. 6-9, p. 44; Doc. 6-8, p. 75).

The ALJ discounted Ms. Davis's complaints of carpal tunnel syndrome symptoms based on objective medical evidence. (Doc. 6-3, p. 33). Dr. Kayl's clinical findings in September 2015 and Ms. Davis's self-reporting of her physical limitations in August 2015 support the ALJ's assessment. (Doc. 6-8, pp. 76-77; Doc. 6-7, p. 33). After Ms. Davis's initial carpal tunnel diagnosis, her medical records contain no evidence of a deteriorating condition.

On this record, substantial evidence supports the ALJ's decision to partially discredit Ms. Davis's testimony concerning the limitations that she attributes to pain. *See Markuske v. Comm'r of Soc. Sec.*, 572 Fed. Appx. 762, 766 (11th Cir. 2014) (A claimant's self-reporting that medication has reduced pain symptoms supports an adverse credibility finding.); *Markuske*, 572 Fed. Appx. at 767 ("The objective medical evidence cited by the ALJ provided 'adequate reasons' for her decision to partially discredit Markuske's subjective complaints [of back, neck, elbow, and carpal tunnel syndrome pain]."). The ALJ did not ignore Ms. Davis's complaints of pain; the ALJ weighed that information in arriving at Ms. Davis's

RFC.  Thus, substantial evidence supports the ALJ's treatment of Ms. Davis's pain testimony.

B.     Hypothetical Questioning

At the fifth stage of the disability framework, the ALJ bears the burden of demonstrating that sufficient jobs exist in the national economy that a plaintiff can perform, given her residual functional capacity.  *Jones v. Apfel*, 190 F.3d 1224, 1229-30 (11th Cir. 1999).   An ALJ typically carries this burden by obtaining testimony from a vocational expert.  Ms. Davis argues that the ALJ did not carry this burden because at her administrative hearing, the ALJ posed to the vocational expert vague questions concerning her (Ms. Davis's) ability to perform unskilled sedentary jobs.

During the hearing, the ALJ asked the vocational expert to consider:

> a hypothetical individual who is capable of performing work at the sedentary level of exertion.  Such individual can occasionally climb, but, of course, not ladders, ropes, or, or scaffolds; occasionally stoop; occasionally kneel, crouch, and crawl; but must avoid concentrated exposure to extreme cold, vibrations, hazardous machinery, and unprotected heights; and they're capable of performing simple, routine job tasks; but would require occasional contact with  the general public and co-workers.  Really, such individual would not be capable of performing any of the past jobs that you've identified as all such jobs exceed sedentary exertional levels.  Would there be jobs that could be performed?  If so, would you identify representative examples?

(Doc. 6-3, p. 70).  The vocational expert answered that Ms. Davis could perform the unskilled positions of final assembler, wire tapper, and optical goods assembler.  (Doc. 6-3, p. 70).

The ALJ followed up, asking:

> Can the jobs that you've identified be performed by an individual who, in addition to [] the limitations set forth in the hypothetical, is capable of performing no more than frequent fine and gross manipulation with the right dominant hand?

(Doc. 6-3, pp. 69-70).  The vocational expert responded, "Yes, they can do these jobs."  (Doc. 6-3, p. 71).  Based on this testimony, the ALJ concluded that Ms. Davis could meet the physical demands of the suggested unskilled jobs despite her carpal tunnel syndrome symptoms.[9]

Ms. Davis argues that the ALJ committed reversible error because he did not clarify the extent to which a person working as a final assembler, wire tapper, or optical goods assembler would "require 'good use' of the hands and fingers for 'repetitive' hand-finger actions."  (Doc. 10, p. 13).  Ms. Davis references SSR 83-10 and § 200.00(b) of Appendix 2 to support her argument.  (Doc. 10, p. 13).

SSR 83-10 summarizes "the activities needed to carry out the requirements of sedentary, light, and medium work [and] are based on the same resource

---

[9] Citing *Patterson v. Brown*, 799 F.2d 1455 (11th Cir. 1986), Ms. Davis observes that the Eleventh Circuit precludes the exclusive reliance on the Medical-Vocational Guidelines when a plaintiff has hand and finger limitations.  (Doc. 10, p. 12).  Here, the ALJ used the Medical-Vocational Guidelines as a framework and relied on the vocational expert's testimony to reach his decision.  (Doc. 6-3, p. 37).

materials noted in section 200.00(b) of Appendix 2." SSR 83-10, 1983 WL 31251, at *5.[10] An ALJ may use SSR 83-10 "to determine if an individual has the ability to perform the full range of sedentary, light, or medium work from an exertional standpoint." SSR 83-10, 1983 WL 31251, at *5. According to SSR 83-10 sedentary work:

> involve[es] lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. By its very nature, work performed primarily in a seated position entails no significant stooping. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.

SSR 83-10, 1983 WL 31251, at *5, ¶ 1. "'Occasionally' means occurring from very little up to one-third of the time." SSR 83-10, 1983 WL 31251, at *5, ¶ 1. Based on an eight-hour work period, "occasional" describes a duration that generally lasts no more than two hours. SSR 83-10, 1983 WL 31251, at *5, ¶ 1. SSR 83-10 does not elaborate on the meaning of "good use of the hands and fingers for repetitive hand-finger actions" associated with most unskilled sedentary jobs. SSR 83-10, 1983 WL 31251, at *5, ¶ 1.

---

[10] Section 200.00(b) of Appendix 2 identifies the following vocational resources: "the 'Dictionary of Occupational Titles' and the 'Occupational Outlook Handbook,' published by the Department of Labor; the 'County Business Patterns' and 'Census Surveys' published by the Bureau of the Census; and occupational surveys of light and sedentary jobs prepared for the Social Security Administration by various State employment agencies." https://www.ssa.gov/OP_Home/cfr20/404/404-app-p02.htm (last visited Dec. 11, 2019).

SSR 96-9p equates "good use of both hands and the fingers" with bilateral manual dexterity. SSR 96-9p, 1996 WL 374185, at *8. "Manual dexterity is the ability to make coordinated hand and finger movements to grasp and manipulate objects."[11] SSR 96-9p explains:

> Most unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity. Fine movements of small objects require use of the fingers; e.g., to pick or pinch. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.
>
> Any *significant* manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base. For example, example 1 in section 201.00(h) of appendix 2, describes an individual who has an impairment that prevents the performance of any sedentary occupations that require bilateral manual dexterity (i.e., "limits the individual to sedentary jobs which do not require bilateral manual dexterity"). When the limitation is less significant, especially if the limitation is in the non-dominant hand, it may be useful to consult a vocational resource.

SSR 96-9p, 1996 WL 374185, at *8 (emphasis in original); *see also* SSR 83-14, 1983 WL 31254, at *4 ("Example 1 of section 201.00(h) in Appendix 2 illustrates a limitation to unskilled sedentary work with an additional loss of bilateral manual

---

[11] *See Encyclopedia of Clinical Neuropsychology* (2011 ed.) available at https://link.springer.com/referenceworkentry/10.1007%2F978-0-387-79948-3_1460 (last visited Dec. 12, 2019).

dexterity that is significant and, thus, warrants a conclusion of 'Disabled.' (The

bulk of unskilled sedentary jobs requires bilateral manual dexterity.)").[12]

Ms. Davis argues that in the hypothetical questions the ALJ posed to the VE,

"there was no agreement between the ALJ and the VE as to what 'good use' or

'repetitive' meant" or "whether someone who can perform 'frequent' fine and

gross manipulation with the dominant hand still has 'good use' of his hand, or can

still perform 'repetitive' hand-finger actions" so that "[w]e can't be sure just what

the VE's answer to ALJ Brownfield's hypothetical meant."  (Doc. 10, p. 14).  Ms.

Davis compares the hypothetical questions in this case to the questions in *Gallegos*

*v. Barnhart*, 99 Fed. Appx. 222 (10th Cir. 2004).  Ms. Davis argues that in

*Gallegos*, the VE expressly construed the term "repetitive" to mean "from two-

thirds to 100 percent of the time."  (Doc. 10, p. 14).  Ms. Davis asserts:  "With that

understanding, the ALJ found that the plaintiff could perform jobs that require

---

[12] The Court notes that § 201.00(h)'s bilateral manual dexterity example no longer appears in appendix 2 to subpart P, part 404 of Title 20.  But the language is available online by accessing earlier versions of Title 20.  https://www.govinfo.gov/content/pkg/CFR-2000-title20-vol2/pdf/CFR-2000-title20-vol2-part404-subpartP-app2.pdf, p. 500:

> A permanent injury of the right hand limits the individual to sedentary jobs which do not require bilateral manual dexterity. None of the rules in appendix 2 are applicable to this particular set of facts, because this individual cannot perform the full range of work defined as sedentary. Since the inability to perform jobs requiring bilateral manual dexterity significantly compromises the only range of work for which the individual is otherwise qualified (i.e., sedentary), a finding of disabled would be appropriate.

(last visited Dec. 11, 2019).

frequent reaching, handling, or fingering (even with an RFC that precluded him from performing repetitive actions with his remaining hand)." (Doc. 10, p. 14).

Here, in Ms. Davis's RFC, the ALJ restricted Ms. Davis's use of her right hand to no more than frequent fine and gross manipulation. (Doc. 6-3, p. 31). The ALJ placed no restrictions on Ms. Davis's use of her left, non-dominant hand. These minimal restrictions are supported by the record because, as discussed, Ms. Davis's medical records contain no indication that her carpal tunnel syndrome causes significant functional limitations. "Frequent" describes a duration that lasts approximately six hours of an eight-hour work period. SSR 83-10, 1983 WL 31251, at *6, ¶ 2. Thus, the ALJ concluded that Ms. Davis retained the good use of her hands and fingers for six hours of an eight-hour period. True, the ALJ and the VE did not verbally agree on the meaning of the term "frequent" in the ALJ's second hypothetical question, but the ALJ properly relied on the vocational expert's familiarity with the applicable regulations which define the term "frequent."

According to the *Dictionary of Occupational Titles*, the positions of final assembler (or optical goods assembler) and wire wrapper (or patcher) require no more than frequent reaching, handling, and fingering. (*See* Doc. 6-3, p. 37) (identifying DOT classifications 713.687-018 and 723.687-010); *see also* DOT, 713.687-018 (final assembler), 1991 WL 679271 (4th ed. 1991) ("Reaching:

Frequently - Exists from 1/3 to 2/3 of the time[;] Handling: Frequently - Exists from 1/3 to 2/3 of the time[; and] Fingering: Frequently - Exists from 1/3 to 2/3 of the time[.]"; DOT, 723.687-010 (patcher), 1991 WL 679524 (4th ed. 1991) (same). Therefore, the ALJ carried his burden at the fifth stage of the sequential disability analysis.

Ms. Davis has not provided evidence to overcome the ALJ's conclusion that she can perform the jobs of final assembler or wire wrapper despite her carpal tunnel syndrome symptoms. *See Williams v. Barnhart*, 140 Fed. Appx. 932, 936 (11th Cir. 2005) ("After the ALJ identifies alternative work, the burden shifts to the claimant to demonstrate that he is unable to perform those jobs.") (citing *Phillips v. Barnhart*, 357 F.3d 1232, 1239 (11th Cir. 2004)); *cf. Griffis v. Astrue*, 619 F. Supp. 2d 1215, 1222, 1221, 1219 (M.D. Fla. 2008) (remanding when the plaintiff "rebutted the presumption he c[ould] perform the unskilled sedentary positions" through the opinion of a "certified vocational evaluation specialist," and the ALJ did not challenge that expert's qualifications or testing results). Consequently, the Court finds no fifth-step basis for remand.

## V.     CONCLUSION

For the reasons discussed above, the Court affirms the Commissioner's decision.

**DONE** this 30th day of December, 2019.

_____

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE